**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE ) | **MDL No. 1354 (NG)** |
| ) | **Civil Action No. 00cv11912-NG** |
| **CITIGROUP, INC.** ) | **(LEAD DOCKET NO.)** |
| **CAPITAL ACCUMULATION** ) | |
| **PLAN LITIGATION** ) | Rodemer v. Smith Barney, Inc., |
| ) | 02CV10598 (ORIGINAL DOCKET NO.) |
| ) | D. Colo. No. 01-CV-02133 |
| **JOHNIE F. WEEMS, III, on behalf of** ) | |
| **of himself and others similarly situated,** ) | Renaudin v. Smith Barney, Inc., |
| **Plaintiff,** ) | 02CV10542 (ORIGINAL DOCKET NO.) |
| ) | E.D. La. No. 01-CV-03170 |
| **v.** ) | |
| ) | Barber v. Citigroup Global Markets Inc., |
| **CITIGROUP INC., TRAVELERS** ) | 07CV10677 (ORIGINAL DOCKET NO.) |
| **GROUP, INC., SALOMON SMITH** ) | E.D. Mich. No. 07-CV-10606 |
| **BARNEY HOLDINGS., SALOMON,** ) | |
| **SMITH BARNEY INC., AND** ) | Hundt v. Citigroup Global Markets Inc., |
| **PRIMERICA FINANCIAL SERVICES,** ) | 06CV12095 (ORIGINAL DOCKET NO.) |
| **INC.,** ) | D. Neb. No. 06-CV-03248 |
| **Defendants.** ) | |

GERTNER, D.J.:

# TABLE OF CONTENTS
### MEMORANDUM AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS FOR CLASS CERTIFICATION
January 6, 2010

I.   BACKGROUND ................................................... -4-
     A.   Facts .................................................... -4-
          1.   The Inception of the Plan ......................... -4-
          2.   The CAP Programs .............................. -4-
          3.   The Purpose of CAP ............................. -7-
          4.   Named Plaintiffs' Participation in the Plan .......... -8-
          5.   Other Facts Relevant to Certification of the Nebraska and
               Michigan Classes .............................. -9-
     B.   Procedural History ........................................ -10-

II.  CLASS CERTIFICATION ......................................... -12-
     A.   Rule 23(a)(1): Numerosity ................................ -14-
     B.   Rule 23(a)(2): Commonality .............................. -19-
     C.   Rule 23(a)(3): Typicality ................................ -19-
     D.   Rule 23(a)(4): Adequacy of Representation .................. -20-

E.    Rule 23(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

III.    SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-
A.    Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-
B.    Standing to Challenge the Bonus Program . . . . . . . . . . . . . . . . . . . . -26-
C.    Colorado Wage Claim Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-
D.    Louisiana Labor Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -30-
E.    Breach of Employment Contract Claims . . . . . . . . . . . . . . . . . . . . . . . -33-
F.    Breach of CAP Contract Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -36-
G.    Conversion Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-
H.    Unjust Enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-
I.    Renaudin's Claims for Interest on Forgone Cash Compensation . . . . -42-

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -43-

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE | ) |
| | ) |
| CITIGROUP, INC. | ) |
| CAPITAL ACCUMULATION | ) |
| PLAN LITIGATION | ) |
| | ) |
| | ) |
| JOHNIE F. WEEMS, III, on behalf of | ) |
| of himself and others similarly situated, | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | ) |
| | ) |
| CITIGROUP INC., TRAVELERS | ) |
| GROUP, INC., SALOMON SMITH | ) |
| BARNEY HOLDINGS., SALOMON, | ) |
| SMITH BARNEY INC., AND | ) |
| PRIMERICA FINANCIAL SERVICES, | ) |
| INC., | ) |
|     Defendants. | ) |

MDL No. 1354 (NG)
Civil Action No. 00cv11912-NG
(LEAD DOCKET NO.)

Rodemer v. Smith Barney, Inc.,
02CV10598 (ORIGINAL DOCKET NO.)
D. Colo. No. 01-CV-02133

Renaudin v. Smith Barney, Inc.,
02CV10542 (ORIGINAL DOCKET NO.)
E.D. La. No. 01-CV-03170

Barber v. Citigroup Global Markets Inc.,
07CV10677 (ORIGINAL DOCKET NO.)
E.D. Mich. No. 07-CV-10606

Hundt v. Citigroup Global Markets Inc.,
06CV12095 (ORIGINAL DOCKET NO.)
D. Neb. No. 06-CV-03248

GERTNER, D.J.:

## MEMORANDUM AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS FOR CLASS CERTIFICATION
January 6, 2010

Plaintiffs Steven Rodemer ("Rodemer") and Jerome Renaudin ("Renaudin") brought

their cases on behalf of Colorado and Louisiana plaintiffs to challenge Citigroup, Inc.'s[1] Capital

Accumulation Plan ("CAP" or "the Plan"). Senior District Judge Robert E. Keeton granted

motions to certify these classes on March 1, 2006. Defendants moved for summary judgment

against Rodemer and Renaudin's classes (document #741), and, in response, these plaintiffs filed

a cross-motion for summary judgment (document #753). Separately, three Nebraska plaintiffs,

---

[1] The defendants in these cases are Citigroup, Inc.; Citigroup Global Markets, Inc.; Salomon Smith Barney Inc.; Salomon Smith Barney Holdings, Inc.; Primerica Financial Services, Inc.; Travelers Group, Inc.; and Citifinancial, Inc. For clarity, they will be collectively referred to as "Citigroup" or "the defendants."

Craig Hundt ("Hundt"), Brett Neal ("Neal"), and Judd Norman ("Norman"), and a Michigan plaintiff, Barry Barber ("Barber"), moved for certification of Nebraska and Michigan classes (documents #765 and #769).

These cases are part of a larger set of challenges to the Plan, which allows certain employees to choose to receive part of their compensation in Citigroup stock. While Citigroup issues the stock at a discount, it does not fully vest until two years after issuance. CAP requires participating employees to forfeit unvested shares--and whatever wages they would have received instead of those shares--if they voluntarily leave the company before the two-year period has passed. Multidistrict Litigation Order No. 1354 consolidated these cases with other member cases for pretrial proceedings in this court. See 28 U.S.C. § 1407. Plaintiffs seek damages primarily for unpaid wages.

Three other challenges to CAP have been rejected by this Court. The first lawsuit was by a class of Florida plaintiffs, Slutzky v. Smith Barney, Inc., the second by a former Citigroup employee in Georgia, Gilmore v. Smith Barney, Inc., and the third by a class of Texas plaintiffs, Mewhinney v. Citigroup, Inc. See Final Judgment, Gilmore v. Smith Barney, Inc. (entered July 25, 2006) (document #616); Final Judgment, Slutzky v. Smith Barney, Inc. (entered Nov. 28, 2006) (document # 650); Final Judgment, Mewhinney v. Citigroup (entered Aug. 8, 2008) (document #717). The First Circuit affirmed the first two final judgments, and the Texas plaintiffs did not appeal. See In re Citigroup, Inc. Capital Accumulation Plan Litig., 535 F.3d 45, 63 (1st Cir. 2008) (document # 714).

Various other member cases have been dismissed by stipulation. See Stipulation of Dismissal (entered Nov. 21, 2008) (document #734) (dismissing with prejudice cases involving

Arizona, Mississippi, Montana, and North Carolina plaintiffs); Stipulation of Dismissal (entered

Mar. 17, 2009) (document #751) (dismissing with prejudice a case involving a Maryland

plaintiff, <u>Andrews v. Citigroup Global Markets Inc.</u>).  After the Connecticut Supreme Court and

the Massachusetts Supreme Judicial Court answered certified questions regarding <u>Lomas v.

Citigroup, Inc.</u> (a Connecticut class) and <u>Peckler v. Citigroup, Inc.</u> (a Massachusetts class), this

Court dismissed those cases as well.  <u>See</u> <u>Weems v. Citigroup Inc.</u>, 900 N.E.2d 89 (Mass. 2009)

(document #745); <u>Weems v. Citigroup Inc.</u>, 961 A.2d 349 (Conn. 2008) (document #739-2);

Order of Dismissal (entered May 21, 2009) (document #763).

Each of the cases in this multidistrict litigation differs slightly because of variations in

state laws.  But notwithstanding those differences, the First Circuit's decision in <u>In re Citigroup</u>

and this Court's decision in <u>Mewhinney</u> plainly go a long way in resolving these challenges.  <u>See</u>

<u>In re Citigroup</u>, 535 F.3d 45 (document #714); <u>Mewhinney v. Citigroup, Inc.</u>, Order on Cross

Motions for Summary Judgment (document #716).  The contract documents are the same and the

rules governing the Court's interpretation of those documents are largely the same.  What needs

to be scrutinized to see if they require a different outcome are the labor statutes and the

approaches to public policy of the various states.

I find that the differences between Florida, Georgia, and Texas law, on the one hand, and

Colorado and Louisiana law, on the other, do not affect the outcome of the case.  As a result, the

Court **GRANTS** defendants' motion for summary judgment (document #741) and **DENIES**

plaintiffs' motion for summary judgment (document #753).  The Court also **GRANTS IN PART**

and **DENIES IN PART** the motions for class certification in Nebraska (document #765) and

Michigan (document #769).

## I.   <u>BACKGROUND</u>

### A.   <u>Facts</u>

CAP allows its participants, certain Citigroup employees, to receive restricted Citigroup stock in lieu of some of their cash compensation.  Rodemer, Renaudin, Hundt, Neal, Norman, and Barber all participated in versions of the Plan.  The following explanation sets forth the facts that are uncontested and notes the parties' respective positions on facts that are in dispute.

### 1.   <u>The Inception of the Plan</u>

The first version of CAP was Primerica Corporation's "Incentive and Retention Plan," adopted in 1989.  The Colorado and Louisiana plaintiffs describe the current Citigroup plan as a continuation of Primerica's and focus on events that occurred between 1989 and 1991.  <u>See</u> Colorado and Louisiana Pls.' Stmt. of Material Facts (document #753-2).  Citigroup argues that the history of the Plan is irrelevant to a determination of the meaning of the Plan, but admits that Primerica's plan is a "predecessor" to CAP.  Def.'s Resp. to Stmt. of Material Facts at 2 (document #761).

### 2.   <u>The CAP Programs</u>

CAP includes two types of programs, the Payroll Program and the Bonus Program.  The Payroll Program, also called the "Financial Consultant Program," is voluntary for the individuals in this lawsuit.  Def.'s Stmt. of Material Facts ¶ 5 (document #743).  The defendants argue that participants in the Payroll Program receive restricted stock that vests after two years in place of cash compensation, while the plaintiffs state that participants receive only a "book entry and an unsecured promise to receive stock in Citigroup, if and when their restricted shares vest."  Id. ¶¶ 5-6; Pls.' Resp. to Stmt. of Material Facts ¶ 5 (document #754).  Under either account, the

amount of stock awarded is a portion of the commissions that financial consultants would otherwise receive. Def.'s Stmt. of Material Facts ¶ 5 (document #743); Pls.' Stmt. of Material Facts ¶ 2 (document #753-2). According to the forms signed by the plaintiffs, they had options as to what percentage of their compensation would be restricted stock. See Def.'s Stmt. of Material Facts ¶ 7-8 (document #743); Steven Rodemer's Election to Receive Restricted Stock (document #744-5); Jerome Renaudin's Election to Receive Restricted Stock (document #744-6). None of the named plaintiffs in these cases participated in the Bonus Program. Def.'s Stmt. of Material Facts ¶ 13 (document #743); Laine Joelson Cohen Decl. ¶ 3 (document #773-3).[2]

Participants in CAP risk forfeiture of their shares if they leave voluntarily before the shares vest. Def.'s Stmt. of Material Facts ¶ 12 (document #743). The plaintiffs argue that they effectively did not have notice of forfeiture because the Plan material they received did not "disclose defendants' intent to seize plaintiffs' earned wages." Pls.' Resp. to Stmt. of Material Facts ¶ 21 (document #754). Plaintiffs also allege that Smith Barney compensated brokers based on a commission grid, and that Plan documents did not state that the Plan superseded the grids. Id. ¶ 22. Defendants counter that the one-page election forms Rodemer and Renaudin signed explain the forfeiture provision and state that the contribution is irrevocable. In addition, they note that various prospectuses described forfeiture as well. Def.'s Resp. to Stmt. of Material Facts at 21-25 (document #761); Steven Rodemer's Election to Receive Restricted Stock (document #744-5); Jerome Renaudin's Election to Receive Restricted Stock (document #744-6).

---

[2] The Louisiana and Colorado named plaintiffs apparently deny defendants' statement that they did not participate in the program, see Pls.' Resp. to Stmt. of Material Facts ¶ 13 (document #754), but they have offered no evidence of their participation. Moreover, Rodemer has admitted that he did not participate. See Rodemer Dep. at 101:12-21 (document # 744-3)

The plaintiffs and Citigroup present different versions of the mechanism for crediting stock awards in the Payroll Program.  Plaintiffs allege that the defendants withheld a portion of "earned commissions" each month and placed them in an interest-bearing account between semiannual award dates.  Pls.' Stmt. of Material Facts ¶ 2, 3, 5 (document #753-2).  The defendants dispute that funds allocated to CAP were "earned commissions" because the compensation was subject to a vesting requirement.  See Def.'s Resp. to Stmt. of Material Facts at 3 (document #761).  They characterize pay stub notations in a "deduct" column as allocations based on the individual's choice to participate in CAP.  Id. at 4.

Plaintiffs also note that CAP participants received accrued interest in 1990, but not in later years.  Pls.' Stmt. of Material Facts ¶¶ 6-7 (document #753-2).  The defendants respond that the plaintiffs have not provided any evidence that the funds allegedly deducted were ever placed in an interest bearing account.  See Def.'s Resp. to Stmt. of Material Facts at 3 (document #761).  They state that the Plan initially credited interest to brokers in order to deal with a "time lag" between the normal monthly payroll dates and the six-month award dates.  Id. at 11-12 (quoting John M. Fowler dep. at 193:19-22 (document # 755-9)).  When the Plan changed to a system of averaging share prices over the term, the company decided  it was no longer necessary to account for the time before the award date.  Id. at 12-13.

The parties appear to agree on a couple of related accounting matters.  Smith Barney transferred money to Citigroup at six month periods, and the company's books credited the broker with restricted shares.  Pls.' Stmt. of Material Facts ¶¶ 3, 5 (document #753-2); Def.'s Resp. to Stmt. of Material Facts at 7 (document #761).  If the employee ended up forfeiting the shares according to the terms of the Plan--because he left before the two year vesting period had

passed--Citigroup would return the money to Smith Barney. Pls.' Stmt. of Material Facts ¶ 4

(document #753-2); Def.'s Resp. to Stmt. of Material Facts at 7-8 (document #761).[3]

It is clear that brokers receive certain benefits from participation in the Payroll Program.

Financial consultants are able to defer income tax until the shares vest. Def.'s Stmt. of Material

Facts ¶ 14(a) (document #743). In addition, Citigroup awards the stock at a discounted rate

relative to market value. Id. ¶ 14(b). Although the plaintiffs admit that they could defer taxes

and obtain the restricted stock at a discounted rate, they characterize these benefits as "illusory"

and state that the Plan provides them with no "tangible benefit." Pls.' Resp. to Def.'s Stmt. of

Material Facts ¶¶ 14(a)-(b), 23-24 (document #754). On a related note, Citigroup claims that,

before vesting, participants were entitled to dividends and to direct the vote of shares, while the

plaintiffs dispute that they ever had these rights with regard to the forfeited stock. Def.'s Stmt.

of Material Facts ¶ 14(c) (document #743); Pls.' Resp. to Def.'s Stmt. of Material Facts ¶ 14(c)

(document #754).

### 3.    **The Purpose of CAP**

The parties disagree about the purpose of the Plan. The plaintiffs state that the

defendants designed the Plan to "penalize brokers" who leave to work for a competitor. Pls.'

Resp. to Stmt. of Material Facts ¶ 20 (document #754). Accordingly, plaintiffs claim, the

forfeiture provision did not apply to employees who "died, retired or became disabled." Pls.'

Stmt. of Material Facts ¶ 8 (document #753-2). In contrast, the defendants quote a plan

---

[3] The plaintiffs allege that Citigroup was aware of criticism of the Plan's predecessor. Two memoranda from 1989 demonstrate that the company knew that some employees were upset about a provision that forfeited withheld money that had not yet been credited as shares, as well as the Plan's nonpayment of interest. Pls.' Stmt. of Material Facts ¶¶ 10-13 (document #753-2); Mem. from J.H. Dietzel (June 8, 1989) (document #755-11); Mem. from J.H. Dietzel (June 9, 1989) (document #755-12). Defendants argue that the concerns of employees in 1989 are irrelevant. See Def.'s Resp. to Stmt. of Material Facts at 16-19 (document #761).

document stating that Citigroup designed the Plan to "attract, retain . . . motivate . . . compensate . . . and . . . encourage ownership of stock." Def.'s Resp. to Stmt. of Material Facts at 20 (document #761) (quoting Plan Document dated July 23, 1997, at D 003032 (document #744-13)). Citigroup acknowledges, however, that an internal memorandum dated May 23, 1991, included as a possible plan objective "'punish[ing]' those who leave and go to a competitor." Def.'s Resp. to Pls.' Stmt. of Material Facts at 20-21 (document #761) (quoting Mem. from J.H. Dietzel to B.L. Mannes at D 006637 (May 23, 1991) (document #755-8)); see Pls.' Resp. to Def.'s Stmt. of Material Facts ¶ 20 (document #754).

### 4.    Named Plaintiffs' Participation in the Plan

Rodemer and Renaudin worked as financial consultants for Salomon Smith Barney Inc. beginning in 1978 and 1989. Def.'s Stmt. of Material Facts ¶¶ 1-2 (document #743). For at least part of their tenures, Rodemer and Renaudin respectively directed 5% and 15% of their incomes to CAP. See id. ¶¶ 7-8; Steven Rodemer's Election to Receive Restricted Stock (document #744-5); Jerome Renaudin's Election to Receive Restricted Stock (document #744-6). They voluntarily resigned in 1999 and 2000 for other financial jobs. Def.'s Stmt. of Material Facts ¶¶ 1-3 (document #743).[4] Similarly, Hundt, Neal, Norman, and Barber are former Salomon Smith Barney Inc. stockbrokers who were enrolled in CAP and voluntarily left their jobs. Hundt v. Citigroup Compl. at 2 (document #773-2); Barber v. Citigroup Compl. ¶ 4 (document #773-7).

The plaintiffs received less cash compensation for the two-year period before leaving the company than they would have received if they had not participated in the Plan. Rodemer and

---

[4] More specifically, Rodemer left Salomon Smith Barney on July 1, 1999, which is relevant to a statute of limitations issue. See Rodemer Dep. at 82:9-12 (document #744-3); infra Section III.A.

the other Colorado class members forfeited stock that corresponded to approximately $14,000

and $1.4 million in cash compensation, respectively.  See Def.'s Stmt. of Material Facts ¶¶ 15-16

(document #743).  However, they did not forfeit some of the stock they received because the

two-year period had passed before they left the company.  Rodemer had received stock worth at

least $200,000 and his fellow class members received stock worth $8.2 million at vesting.  Id.

Similarly, Renaudin and his fellow Louisiana class members gave up $190,000 and $1.4 million

in cash compensation for stock that never vested, and had received vested stock worth $465,000

and $6.2 million.  Id. ¶¶ 17-18.  Rodemer testified in a deposition that he was asked to

participate in the Plan, but did not feel pressured to do so.  Rodemer Dep. at 81:3-82:2

(document #744-3).  Renaudin said that the company recommended the Plan, but would not say

that he was "induced" to participate.  Renaudin Dep. at 77:16-23 (document #744-4).

### 5.    Other Facts Relevant to Certification of the Nebraska and Michigan Classes

The court has previously certified class actions for Colorado, Connecticut, Florida,

Louisiana, Massachusetts, New York, North Carolina, and Texas.  The putative Nebraska and

Michigan classes consist of former Smith Barney Employees in Nebraska and Michigan who

forfeited income under CAP since January 1, 1990.  Mem. in Support of Mot. to Certify Class in

Nebraska at 3 (document #766); Mem. in Support of Mot. to Certify Class in Michigan at 3

(document #770).  There are at least 33 individuals who would be eligible for the proposed

Nebraska class, and at least 144 individuals for the proposed Michigan class.  See Letter from

Nicholas I. Leitzes (June 23, 2009) (document #767-2).  Within the Nebraska class, a total of 20

individuals were enrolled in the Payroll Program and 14 in the Bonus Program.  Id.  In the

Michigan class, 102 individuals were in the Payroll Program and 44 in the Bonus Program.  Id.

(The total numbers include one individual in Nebraska and two individuals in Michigan who were enrolled in both programs.)  While the proposed classes have the potential to grow as more individuals leave Citigroup and forfeit a portion of their CAP stock, growth will be limited because there are only 86 remaining participants in the CAP Payroll Program, none of whom are in Nebraska.  Laine Joelson Cohen Decl. ¶ 8 (document #773-3).

### B.     Procedural History

Renaudin initially filed his complaint in the Eastern District of Louisiana on October 19, 2001, while Rodemer filed his case in the District of Colorado on October 30, 2001.  See Renaudin v. Smith Barney, Inc., Compl. (document #1 in E.D. La. 01-cv-03170);[5] Rodemer v. Smith Barney, Inc., Compl. (document #744-2).  The Multidistrict Litigation Panel ("the Panel") transferred these cases to the District of Massachusetts on December 5, 2001, and March 11, 2002.  Hundt, Norman, and Neal filed their lawsuit in the District of Nebraska on October 18, 2006, and the Panel transferred the case on November 7, 2006.  Hundt v. Citigroup Global Markets Inc., D. Neb. 06-cv-03248.  Barber filed his case in the Eastern District of Michigan on February 9, 2007, and the Panel transferred the case on March 19, 2007.  Barber v. Citigroup Global Markets Inc., E.D. Mich. 07-cv-10606.

On March 1, 2006, Judge Robert E. Keeton granted motions to certify the Colorado and Louisiana classes, with Renaudin and Rodemer as class representatives.  The classes consist of "all individuals formerly employed by" defendants in Colorado and Louisiana who participated in either of the CAP plans "and lost the right to receive shares of stock and/or options and/or other earned income under the terms of the Plan, and/or did not receive earned income while

---

[5] Renaudin later amended his complaint.  See Renaudin v. Smith Barney, Inc., Am. Compl. (document #315).

employed by Smith Barney."  Colorado Pls.' Mem. in Support of Mot. for Class Certification at 2 (document #545); Louisiana Pls.' Mem. in Support of Mot. for Class Certification at 2 (document #547).  The classes also include any individuals who meet these criteria after the date of class certification.

All of the plaintiffs present similar claims against Citigroup.  Rodemer alleges the following causes of action under Colorado law: (1) violation of the Colorado Wage Claim Act (Colo. Rev. Stat. § 8-4-105); (2) breach of employment contract; (3) breach of CAP contract; (4) conversion; and (5) unjust enrichment.  Rodemer v. Smith Barney, Inc., Compl. ¶¶ 12-47 (document #744-2).  Renaudin asserts five claims against the defendants on behalf of the Louisiana class: (1) violation of the Louisiana Labor Statute (La. Rev. Stat. Ann. §§ 23:631, 23:634); (2) breach of employment contract; (3) breach of CAP contract; (4) conversion; and (5) unjust enrichment.  Renaudin v. Smith Barney, Inc., Am. Compl. ¶¶ 9-37 (document #315).  He also includes claims for breach of employment contract, conversion, and unjust enrichment for interest on money withheld during a six-month period prior to conversion to restricted stock.  Id. ¶¶ 38-50.[6]  The plaintiffs in the Nebraska and Michigan cases allege (1) breach of employment contract; (2) breach of CAP contract; (3) conversion; and (4) unjust enrichment.  Hundt v. Citigroup Global Markets Inc., Compl. ¶¶ 10-34 (document #773-2); Barber v. Citigroup Global Markets Inc., Compl. ¶¶ 15-39 (document #773-7).

The defendants counterclaimed against all of the plaintiffs for benefits previously received under the Plan.  They argued that if the Plan were invalidated, the Plan's purpose in

---

[6] Renaudin alleges these claims on behalf of a proposed national class, but that class has not been certified.  See Renaudin v. Smith Barney, Inc., Am. Compl. ¶¶ 38-50 (document #315).

retaining employees would be undermined.  As such, defendants allege, plaintiffs should be restored to the status quo ante by repaying money they had received under the Plan.  Renaudin v. Smith Barney, Inc., Answer at 6-8 (document #316); Rodemer v. Smith Barney, Inc., Answer at 5-6 (document #185); Hundt v. Citigroup Global Markets, Inc., Answer at 6-7 (document #8 in D. Neb. 06-cv-03248); Barber v. Citigroup Global Markets Inc., Answer at 7-8 (document #680).

Citigroup now seeks summary judgment on all claims in Rodemer and Renaudin's complaints.  Def.'s Mot. for Summary Judgment in the Colo. and La. Cases at 1 (document #741).  The Colorado and Louisiana plaintiffs cross-move for summary judgment, or in the alternative for certification of unclear questions of law to the Colorado and Louisiana Supreme Courts.  Pls.' Cross-Mot. for Summary Judgment in the Colo. and La. Cases at 1-2 (document #753).  Hundt, Neal, Norman, and Barber request class certification for Nebraska and Michigan.  See Mot. to Certify Neb. Class (document #765); Mot. to Certify Mich. Class (document #769).

## II.    CLASS CERTIFICATION

The Nebraska plaintiffs seek certification of the following class:

> All individuals formerly employed by Salomon Smith Barney, its predecessors, successors, related or affiliated companies ("Smith Barney") in Nebraska who participated in the Citigroup Capital Accumulation Plan, the Travelers Group Capital Accumulation Plan, or the Primerica Capital Accumulation Plan (the "Plan"), and lost the right to receive shares of stock and/or options and/or other earned income under the terms of the Plan and/or did not receive earned income while employed by Smith Barney.  The class will include all participants who, after the date of class certification . . . lose the right to stock and/or options and/or earned income under the Plan upon termination of their employment with Salomon Smith Barney and/or Citigroup.

Mem. in Support of Mot. to Certify Neb. Class at 2 (document #766).  The proposed Michigan class is identical except the word "Michigan" replaces the word "Nebraska."  Mem. in Support of Mot. to Certify Mich. Class at 2 (document #770).

In the First Circuit, a district court must "conduct a rigorous analysis of the prerequisites established by Rule 23 before certifying a class."  Smilow v. Sw. Bell Mobile Sys., 323 F.3d 32, 38 (1st Cir. 2003).  All federal class action suits must meet the Rule 23(a) requirements of "numerosity," "commonality," "typicality," and "adequacy of representation."  Id. at 38.[7]  The defendants essentially do not contest the requirements of "commonality" and "typicality" for either case, and question "numerosity" only with regard to the proposed Nebraska class.  Nevertheless, the Court will consider all of these prongs, in light of the First Circuit's admonition to perform a "rigorous analysis" when deciding class certification issues.  Id. at 38.

In addition to the Rule 23(a) requirements, a class action must meet the criteria of at least one of the three types of class actions described in Rule 23(b).  The plaintiffs allege that the proposed classes satisfy the criteria for *all three* types of class action.  Mem. in Support of Mot. to Certify Neb. Class at 10 (document #766); Mem. in Support of Mot. to Certify Mich. Class at 10 (document #770).  Rule 23(b)(1) allows class actions when separate actions would (A) risk inconsistent adjudications and conflicting standards of conduct for the party opposing the class or (B) impair, impede, or be dispositive of the rights of other individual class members.  Rule

---

[7] District courts generally should apply the law of their own circuit when deciding a question of federal law (such as a rule of civil procedure) in a Multidistrict Litigation case,.  Kendall v. Metro. Life Ins. Co., 324 F. Supp. 2d 288, 297 (D. Mass. 2004) (citing Montana v. Abbot Labs, 266 F. Supp. 2d 250, 259-60 (D. Mass. 2003)).  Nevertheless, the Court should "close[ly] consider[]" the law of the circuit from which the case has been transferred.  Id. at 298 (citing In re Korean Air Lines Disaster, 829 F.2d 1171, 1174 (D.C. Cir. 1987)).  This opinion explains First Circuit case law, and, where appropriate, considers the law of the Eighth Circuit (for the Nebraska plaintiffs) and the Sixth Circuit (for the Michigan plaintiffs).

23(b)(2) permits class actions when the party opposing the class acted in a way that applies to the class generally, so injunctive or declaratory relief would be an appropriate remedy for the whole class. Finally, Rule 23(b)(3) allows class actions when common questions of law or fact "predominate over any questions affecting only individual class members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The two criteria in 23(b)(3) are commonly referred to as "predominance" and "superiority."

### A.    Rule 23(a)(1): Numerosity

The plaintiffs contend that the Nebraska class is sufficiently large for a class action because there are already at least 33 individuals who would be eligible for the class, and the class will grow as more individuals voluntarily leave Smith Barney. The defendants respond that the class should be divided into subclasses based on membership in the two CAP programs. Twenty potential class members were enrolled in the Payroll Program and fourteen individuals participated in the Bonus Program, including one individual in both programs. See Letter from Nicholas I. Leitzes (June 23, 2009) (document #767-2). Indeed, the Court has previously dealt with the two programs separately. In the New York and Florida cases, the Court granted summary judgment regarding the Payroll Program, but deferred summary judgment on the Bonus Program. See Practice and Procedure Order 19, at 18 (document #494). Similarly, in the Texas case, the Court ruled on the Payroll Program but stated that it could not adjudicate any challenge to the Bonus Program because the class representative did not have standing. See Mewhinney Order at 15-16 (document #716). The Connecticut Supreme Court and Massachusetts Supreme Judicial Court also separately analyzed whether the Payroll and Bonus

-14-

Programs complied with their respective state laws.  Weems v. Citigroup Inc., 961 A.2d at 357-360; Weems v. Citigroup Inc., 900 N.E.2d at 94-96.

Given this history of denying standing when class representatives did not participate in the Bonus Program, and of deciding issues involving the Payroll and Bonus Programs separately, it is appropriate to divide the class into subclasses before deciding certification questions.  See Andrews v. Bechtel Power Corp., 780 F.2d 124, 131 (1st Cir. 1985) (approving division into subclasses before analyzing numerosity with respect to each subclass); In re Neurontin Mktg., Sales Practices and Products Liability Litigation, 244 F.R.D. 89, 106 (D. Mass. 2007) ("[G]iven my determination that subclasses are required, plaintiffs must allege numerosity . . . for each subclass . . . .").  The plaintiffs cite two older cases that delayed certification of subclasses until common issues had been decided, but neither case addressed how this would affect the numerosity determination.  See Vernon J. Rockler & Co. v. Graphic Enterprises, Inc., 52 F.R.D. 335, 346 (D. Minn. 1971); Sol S. Turnoff Drug Distributors Inc. v. N.V. Nederlandsche, 51 F.R.D. 227, 233 (E.D. Pa. 1970).  In any event, these cases are inapplicable because courts in this multidistrict litigation have been unable to decide common issues for the class as a whole before reaching separate claims.

The Payroll and Bonus groups are appropriately considered to be distinct because Payroll Program participants cannot argue that they were forced to participate, and Bonus Program participants cannot argue that they lost cash compensation they otherwise would have received.  See Practice and Procedure Order 20, at 11 (document #506).  The classes likely have divergent interests because these factors are often relevant to state public policies.  See In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 271 (3d Cir. 2009) (stating that divergent interests are

-15-

necessary for certification of subclasses); Mewhinney Order at 40-46 (document #716) (considering voluntariness in discussion of Texas public policy); infra Sections III.C, III.D (considering voluntariness and lost compensation as potentially relevant to Colorado and Louisiana labor statutes).  Where the named plaintiffs may not have standing to represent part of the proposed class, and the Payroll Program participants and the Bonus Program participants have divergent interests, the two groups are appropriately considered as subclasses in both the Nebraska and Michigan cases.  See Fed. R. Civ. P. 23(c)(5).

Subclasses must individually satisfy the numerosity requirement.  See Andrews, 780 F.2d at 131-32; Clayborne v. Omaha Pub. Power Dist., 211 F.R.D. 573, 589 (D. Neb. 2002).  In general, courts certify classes of more than 30 or 40 individuals, and deny certification for classes below 20 individuals.  See, e.g., Garcia-Rubiera v. Calderon, 570 F.3d 443, 460 (1st Cir. 2009) (quoting Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001) (stating that 40 plaintiffs is usually sufficient to meet the numerosity requirement)); McAdams v. Mass. Mut. Life Ins. Co., No. 99-cv-30284, 2002 U.S. Dist LEXIS 9944, at *10 (D. Mass. May 15, 2002) (same); Hill v. Butterworth, 170 F.R.D. 509, 514 (N.D. Fla. 1997) (stating that "thirty-some" members would be sufficient); Dellantonio v. City of Indianapolis, No. 08-cv-780, 2009 U.S. Dist. LEXIS 11289 at *8 (S.D. Ind. Feb. 13, 2009) (suggesting that 20 individuals would not satisfy the numerosity requirement); cf. Riordan v. Smith Barney Inc., 113 F.R.D. 60, 62 (N.D. Ill. 1986) (stating that a class of 25-50 individuals may be sufficient in a securities case).

Plaintiffs cite a few cases that certified smaller classes when circumstances warranted. Arkansas Educ. Ass'n v. Bd. of Ed. of Portland held that a class of twenty teachers was sufficiently numerous for a discrimination suit seeking an injunction where the school district

adopted a nondiscriminatory salary schedule that "reduc[ed] the potential members of the class and lessen[ed] the chance of individual actions by the black teachers affected thereby." 446 F.2d 763, 765-66 (8th Cir. 1971). Bradford v. AGCO Corp. certified a class where the defendant said that only twenty individuals would be eligible for the class, and plaintiffs claimed sixty five individuals would be eligible, because joinder would waste judicial resources. 187 F.R.D. 600, 604 (W.D. Mo. 1999).

    In considering whether a class is sufficiently numerous, courts may consider the potential that the class will grow. See Clerk's Notes for Hearing on Motion for Class Certification in Rodemer v. Smith Barney, Inc., (Mar. 1, 2006) (Keeton, J.); Hill, 170 F.R.D. at 513-14; see also Zinser v. Accufix Research Institute, Inc., 253 F.3d 1180, 1198 (9th Cir. 2001) (dissenting opinion). The numerosity requirement, however, does not depend on numbers alone, but also on the practicality of joinder given the ease of ascertaining class members and the geographic distribution of the parties. Andrews, 780 F.2d at 131-32; Gries v. Standard Ready Mix Concrete, L.L.C., 252 F.R.D. 479, 485 (N.D. Iowa 2008); see also Lanning v. Southeastern Pennsylvania Transportation Authority, 176 F.R.D. 132, 147 (E.D. Pa. 1997) ("Although in most cases numerosity would not be satisfied if only twenty-two persons had to be joined, the Court finds that numerosity is satisfied here. . . . [I]t would be almost impossible for plaintiffs to find these women because they do not know in what town, city or municipality that these women live. In addition, plaintiffs do not have the phone numbers for these women. It would seem that joinder in this case is impracticable . . . .").

    I find that the proposed Nebraska Payroll Program subclass satisfies the numerosity requirement. Although this subclass contains only twenty individuals, all of whom are easily

ascertainable from Citigroup's records, this case presents a unique circumstance that warrants certification of a class with twenty members.  See Arkansas Educ., 446 F.2d at 765-66; Bradford, 187 F.R.D. at 604.  The class certification request comes in the course of multidistrict litigation that has been pending for nearly a decade.  This Court has certified nearly identical classes in Colorado, Connecticut, Florida, Louisiana, Massachusetts, New York, North Carolina, and Texas.  Many of those challenges have already been resolved either by summary judgment or stipulated dismissal.  At this stage, joinder of remaining class members would cause unnecessary delay and would therefore be impracticable.  See Ellis v. Elgin Riverboat Resort, 217 F.R.D. 415, 421 (N.D. Ill. 2003) ("To determine whether joinder is impracticable courts must consider the circumstances unique to each case.  Such circumstances include whether . . . it is judicially efficient . . . ."); Bradford, 187 F.R.D. at 604.  Since it is likely that the Nebraska plaintiffs' claims will be resolved either by summary judgment or stipulated dismissal, joinder would merely waste the parties' and the Court's resources.[8]

Both of the proposed Michigan subclasses are sufficiently numerous for class certification.  In that state, at least 102 individuals would be eligible for the payroll subclass and 44 for the bonus subclass (with an overlap of two individuals).  See Letter from Nicholas I. Leitzes (June 23, 2009) (document #767-2).  Considering that both groups are larger than 40, and it is possible that they will grow further, the numerosity requirement is satisfied.

    **B.    Rule 23(a)(2): Commonality**

---

[8] Only fourteen individuals are eligible for the proposed Bonus Program subclass in Nebraska, which does not appear to be large enough to satisfy the numerosity requirement.  In any event, as discussed in Section II.D., the named plaintiffs could not adequately represent the members of a Bonus Program subclass for purposes of Rule 23(a)(4).

The named plaintiffs clearly meet the commonality requirement. They only need to present a single legal or factual issue that is common with the rest of the class members. Moreover, as this Court has previously noted, the question of commonality is "largely irrelevant" when, as here, the "predominance" criterion of Rule 23(b)(3) is in dispute. In re Credit Suisse-AOL Sec. Litig., 253 F.R.D. 17, 22 (D. Mass. 2008) (Gertner, J.) (quoting Swack v. Credit Suisse First Boston, 230 F.R.D. 250, 259 (D. Mass. 2005)). At this point, it suffices to say that the question of whether the defendants failed to pay "earned income" in violation of an employment contract is common to all class members. Hundt v. Citigroup Global Markets Inc., Compl. ¶¶ 10-20 (document #773-2); Barber v. Citigroup Global Markets Inc., Compl. ¶¶ 15-25 (document #773-7).

### C.    Rule 23(a)(3): Typicality

Representative plaintiffs fulfill the typicality criterion when their injuries and those of the class are caused by a common course of conduct by the defendants and the representative plaintiffs' claims "are based on the same legal theory" as those of the class. See Credit Suisse, 253 F.R.D. at 23. In these cases, Hundt, Neal, Norman, Barber and all of the potential Nebraska and Michigan class members forfeited the restricted stock they received because of the common CAP program. Their claims depend on the identical issue of whether this forfeiture constituted a breach of employment contract, breach of CAP contract, conversion, or unjust enrichment. The plaintiffs' claims, therefore, easily satisfy the typicality criterion.

### D.    Rule 23(a)(4): Adequacy of Representation

The adequacy of representation requirement depends on whether the named plaintiffs' interests are consistent with those of other class members and whether they and their attorneys

will "prosecute the case vigorously."  Guckenberger v. Boston Univ., 957 F. Supp. 306, 326 (D.

Mass. 1997).  The plaintiffs contend that they meet these criteria because they suffered the same

type of loss as the other class members, and have extensive business experience in brokerage

firms.  Moreover, their counsel have been litigating cases involving CAP on behalf of classes

from various other states.

　　　　Citigroup does not challenge the adequacy of the named plaintiffs' representation of the

Payroll Program subclass, but does with regard to their representation of the Bonus Program

subclasses.  This Court ruled in the Texas case that standing "must be evaluated with respect to

the representative plaintiff."  See Mewhinney Order at 15-16 (document #716) (citing Warth v.

Seldon, 422 U.S. 490, 502-03 (1975); Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 40 n.20

(1976)).  A named plaintiff cannot adequately represent a subclass when he is not a member of

the subclass he seeks to represent.  Rand v. Cullient Software, Inc., 847 F. Supp. 200, 213 (D.

Mass. 1994) (citing E. Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)).

Accordingly, courts in this district have ruled that class certification is inappropriate when class

representatives do not hold securities that are subjects of the lawsuit.  See In re Eaton Vance

Corp. Sec. Litig., 219 F.R.D. 38, 41-43 (D. Mass 2003); Rand, 847 F. Supp. at 213.[9]  Since

Hundt, Neal, Norman, and Barber are not members of the putative Bonus Program subclasses,

see Laine Joelson Cohen Decl. ¶ 3 (document #773-3), they do not meet the adequacy standard

---

[9] Courts have occasionally addressed standing issues after certifying the class, and found that members of the class
could have standing even though the representative plaintiffs did not.  See, e.g., In Re Relafen Antitrust Litig., 221
F.R.D. 260, 269-270 (D. Mass. 2004).  This approach is appropriate when standing issues exist only because of class
certification, such as when a representative plaintiff would have standing for his own state claims, but seeks to
represent a class in more than one state.  Id.  In contrast, this case presents a situation in which the representative
plaintiff would not have standing for claims based on the Bonus Program regardless of whether the Court certified a
class.  See Mewhinney Order at 15-16 (document #716).

with regard to those subclasses.[10]  Therefore, the Court will not certify Bonus Program

subclasses**.**  The named plaintiffs would, however, adequately represent the Payroll subclass

because they have standing, similar interests to the other members of the class, and have

demonstrated that they will strenuously litigate the case on behalf of the class.

###### E.      Rule 23(b)

The requests for class certification under rules 23(b)(1) and 23(b)(2) are essentially

frivolous.  As a general matter, Rule 23(b)(1)(A) is not appropriate for damages actions, as here,

unless the plaintiffs have provided "sufficient evidence to demonstrate that defendant has

insufficient funds to compensate the pool of potential plaintiffs."  Kent v. SunAmerica Life Ins.

Co., 190 F.R.D. 271, 281 (D. Mass. 2000).  Plaintiffs have made no such showing here.  Rule

23(b)(1)(B) is not applicable because the plaintiffs allege only the risk of precedent being used

against other CAP participants should defendants win a favorable decision on an issue in one

individual case.  See Tilley v. TJX Cos., Inc., 345 F.3d 34, 42 (1st Cir. 2003) ("[T]he

certification of a class under Rule 23(b)(1)(B) cannot rest solely on an anticipated stare decisis

effect.").  Rule 23(b)(2) is an appropriate basis for class certification only when the plaintiff

seeks primarily injunctive relief.  See Markarian v. Conn. Mut. Life Ins. Co., 202 F.R.D. 60, 71

(D. Mass. 2001).  In these cases, the complaints chiefly seek damages.  See Hundt v. Citigroup

Global Markets Inc., Compl. at 11 (document #773-2); Barber v. Citigroup Global Markets Inc.,

Compl. at 8 (document #773-7).  Thus, I turn to Rule 23(b)(3).

---

[10] The plaintiffs argue that Citigroup should be collaterally estopped from arguing that Barber would not adequately represent Bonus Program participants.  See Reply Mem. in Support of Mot. for Class Certification at 4 (document #774).  Collateral estoppel does not apply here because the plaintiffs are neither the same parties as in the prior suits, nor their privies.  See Coors Brewing Co. v. Mendez-Torres, 562 F.3d 3, 8 (1st Cir. 2009); United States v. Bonilla Romero, 836 F.2d 39, 43 (1st Cir. 1987).

The named Nebraska and Michigan plaintiffs contend that they have met the predominance and superiority requirements for certification of a class under this subsection. In deciding the issue of predominance, the Court must predict "how specific issues will play out in order to determine whether common or individual issues predominate in a given case." Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 298 (1st Cir. 2000). The plaintiffs argue that the key question is whether CAP's forfeiture provision was legal under Nebraska and Michigan law, and that this question is common to all class members. Indeed, given the past summary judgment decisions that interpreted the contract against the plaintiffs, the public policies of Nebraska and Michigan are most in doubt. See Mewhinney Order at 40 (document #716) ("Mewhinney argues that the Court should find the contract void as against Texas public policy. It is in this area, if at all, that cases brought within this multidistrict litigation may diverge.").

Citigroup alleges that a key issue in the case is whether Citigroup breached the terms of an oral agreement. See Hundt v. Citigroup Global Markets Inc., Compl. ¶ 16 (document #773-2); Barber v. Citigroup Global Markets Inc., Compl. ¶ 21 (document #773-7). When the existence of an oral agreement is an important question in a case, class certification may be inappropriate because the case will "depend[] on the specific representations made to each plaintiff." McCracken v. Best Buy Stores, L.P., 248 F.R.D. 162, 168 (S.D.N.Y. 2008); see also McCarty v. Mercury Metalcraft Co., 127 N.W.2d 340, 344-45 (Mich. 1964) (noting that mutual assent is required for oral agreements); Lindsay Ins. Agency v. Mead, 508 N.W.2d 820, 825 (Neb. 1993) (same). Although this question would necessarily require individualized inquiry, it is unlikely to be a predominant issue in this case. This Court and the First Circuit Court of Appeals have been able to resolve each of the member cases, either by summary judgment or

-22-

stipulated dismissal, without reaching the issue of individual oral agreements.  Moreover, the

plaintiffs may have waived the issue, since the named plaintiffs do not recall any oral

agreements.  See Hundt Dep. at 80:7-82:20 (document #773-4); Neal Dep. at 44:16-

47:2(document #773-5); Norman Dep. at 44:18-21 (document #773-6); Barber Dep. at 78:13-14

(document #773-8).  The remainder of the claims depend on the application of Nebraska and

Michigan public policy to the same or similar documents for all members of the class.  The

plaintiffs, therefore, have satisfied the predominance criterion.

Fed. R. Civ. P. 23(b)(3) provides four factors that may be relevant to whether a class

action is superior to other methods for resolving the controversy:[11]

> (A) the class members' interests in individually controlling the
> prosecution or defense of separate actions; (B) the extent and
> nature of any litigation concerning the controversy already begun
> by or against class members; (C) the desirability or undesirability
> of concentrating the litigation of the claims in the particular forum;
> and (D) the likely difficulties in managing a class action.

On the first factor, the plaintiffs argue that it would be financially difficult for class members to

pursue the cases individually because the size of individual damages would be insufficient.

Citigroup responds that the average amounts at issue for members of the Nebraska and Michigan

Payroll Program subclasses are approximately $20,000 and $40,000, which they claim would be

enough to maintain a lawsuit.  See Laine Joelson Cohen Decl. ¶¶ 5-6 (document #773-3).

The Supreme Court has explained that class actions are meant to overcome the problem

of small recoveries providing insufficient incentive for individual actions.  Amchem Products,

Inc. v. Windsor, 521 U.S. 591, 617 (1997).  Courts have not reached a consensus about an exact

---

[11] These factors are also sometimes relevant to the question of predominance.  See Fed. R. Civ. P. 23(b)(3); see, e.g.,
Bell v. Woodward Governor Co., 2005 U.S. Dist. LEXIS 60, at *10 (N.D. Ill. Jan. 3, 2005).

amount that would usually overcome the superiority criterion.  An Eastern District of Pennsylvania district court concluded that individual claims alleged to exceed $100,000 per person would "certainly be large enough to make individual suits feasible and therefore, a class action lawsuit is not the superior method of adjudicating this dispute."  Lyon v. Caterpillar, Inc., 194 F.R.D. 206, 222, (E.D. Pa. 2000).  Another court refused to certify a class when individual claims exceeded $60,000.  Stoudt v. E.F. Hutton & Co., 121 F.R.D. 36, 38 (S.D.N.Y. 1988). Other courts have concluded that a class action may be appropriate when some individual claims are small, even if the average claim is large.  See Zinser, 253 F.3d at 1191; Macneal v. Columbine Exploration Corp., 123 F.R.D. 181, 187 (E.D. Pa. 1988).[12]  In these cases, individual brokers were able to select the percentage of their compensation that they would receive in restricted stock, in amounts as small as 5%.  Individuals who chose small amounts would be unlikely to pursue their claims individually, suggesting that a class action would be a superior method for resolving their disputes.  In fact, given that past CAP plaintiffs have had so little success in their litigation against Citigroup, all of the participants may be unlikely to pursue individual suits.  See McIntosh v. Irwin Union Bank & Trust Co., 215 F.R.D. 26, 35 (D. Mass. 2003) ("It cannot be reiterated too strongly that denial of class certification is the effective death knell of this litigation."), abrogated in part on other grounds by McKenna v. First Horizon Home Loan Corp., 475 F.3d 418, 423 (1st Cir. 2007).

---

[12] Regardless of the amounts sought, a class action may not be a superior method if the plaintiffs are likely to recover attorney's fees, such as in a RICO case.  See, e.g., Curley v. Cumberland Farms Dairy, Inc., 728 F. Supp. 1123, 1133 (D.N.J. 1989).  Defendants note that the class representatives seek attorney's fees and punitive damages here, but given the history of deciding cases in this multidistrict litigation against plaintiffs at the summary judgment stage, the mere possibility of recovering attorney's fees or punitive damages may not be sufficient incentive for individual lawsuits.

Citigroup does not contest the remaining factors that affect superiority.  In brief, the pending and finished actions and arbitrations against Citigroup were unavailable to individuals in Nebraska and Michigan, so existing litigation can only favor class treatment.  See Plekowski v. Ralston Purina Co., 68 F.R.D. 443, 453 (M.D. Ga. 1975) ("If there were a substantial number of actions of a similar nature filed in this or other courts, this would be a factor favoring class certification.").  Citigroup has already consolidated the CAP cases, which has already served, and will continue to serve, the purpose of consistent litigation.  See In re Relafen Antitrust Litig., 221 F.R.D. 260, 288 (D. Mass. 2004).  Finally, I do not anticipate significant difficulties in managing these cases as class actions: the individuals in the Payroll Program subclasses are easily identifiable and not too numerous to preclude separate damage calculations.  See id.  In sum, class actions would be the superior method for resolving the claims of CAP Payroll Program participants in Nebraska and Michigan because they are more efficient than individual actions, and may, in a practical sense, be the plaintiffs' only chance to recover forfeited stock awards.  The Court will certify Payroll Program subclasses in Nebraska and Michigan.

III.    **SUMMARY JUDGMENT**

A.    **Legal Standard**

A court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue is 'genuine' if it can be resolved in favor of either party, and a fact is 'material' if it might affect the outcome of the case." Charter Envtl., Inc. v. Shaw Envtl., Inc., 2009 U.S. Dist. LEXIS 83404, at *14 (D. Mass. Sep. 14, 2009) (citing Calero-Cerezo v. United States Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004)). All facts must be considered in the light most favorable to the non-moving party. Fed. R. Civ. P. 56(c); Mariasch v. Gillette Co., 521 F.3d 68, 70 (1st Cir. 2008). The movant bears the burden of showing that there is no genuine issue regarding any material fact in the pleadings, discovery materials, and affidavits, and that the movant is entitled to judgment as a matter of law; if the moving party meets its burden, the burden shifts to the nonmovant to set forth specific facts that demonstrate a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). A summary judgment motion "cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." Ingrams v. Brink's, Inc., 414 F.3d 222, 228-29 (1st Cir. 2005). The summary judgment standard is the same when the parties have filed cross-motions for summary judgment. Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 34 (1st Cir. 2005).

B.    **Standing to Challenge the Bonus Program**

The Colorado and Louisiana classes certified by Judge Keeton, though somewhat vague, most likely include participants in the CAP Bonus Program. See Order on Motions to Certify

Class (Mar. 1, 2006); Colorado Plaintiffs' Mem. in Support of Mot. for Class Certification at 2 (document #545); Louisiana Plaintiffs' Mem. in Support of Mot. for Class Certification at 2 (document #547).  As this Court recognized in the <u>Mewhinney</u> (Texas) case, standing in this type of class action depends on the representative plaintiffs.  <u>See</u> <u>Mewhinney</u> Order at 16 (document #716); <u>see also</u> <u>supra</u> note 9 and accompanying text.  Since Rodemer and Renaudin did not participate in the Bonus Program, they cannot have an injury in fact, and cannot seek relief on behalf of Bonus Program participants.  <u>See</u> <u>Mewhinney</u> Order at 14-16 (document #716); <u>supra</u> note 2 and accompanying text.  This decision, therefore, addresses only the Payroll Program.

### C.    Colorado Wage Claim Act

Rodemer argues that CAP's forfeiture provision violates the Colorado Wage Claim Act ("CWCA").  This act provides that an employer must pay "wages" at certain specified periods unless the employer and employee reach mutual agreement on alternative periods.  Colo. Rev. Stat. § 8-4-103 (formerly Colo. Rev. Stat. § 8-4-105).  Agreements between the employer and employee regarding wages cannot, however, "waive or . . . modify" an employee's rights in violation of the CWCA.  <u>Id.</u> § 8-4-121.  The purpose of the Colorado Wage Claim Act is to "require employers to make timely payment of compensation earned by their employees." <u>Barnes v. Van Schaack Mortgage</u>, 787 P.2d 207, 209 (Colo. Ct. App. 1990).  Citigroup contends that Rodemer's claim is time-barred, and that, even if it were timely, CAP restricted stock does not constitute "wages" under the statute.  Rodemer has not responded to the statute of limitations argument.

The CWCA includes a statute of limitations for non-willful violations of two years from the "next regular payday" after an employee's resignation. Colo. Rev. Stat. §§ 8-4-109(1)(b), 8-4-122. Rodemer resigned on July 1, 1999. See Rodemer Dep. at 82:9-12 (document #744-3). Since pay periods must be no longer than a month and regular paydays must be no later than 10 days after the close of a pay period, the last possible day for Rodemer's next regular payday was August 11, 1999. See id. § 8-4-103(1). Rodemer filed his lawsuit on October 30, 2001; any claim of a non-willful violation is untimely. Assuming, however, that Rodemer's claim is based on a "willful" violation--not directly alleged in his complaint--he did file within the three year statute of limitations for that type of action. Id. § 8-4-122.

Citigroup contends that CAP restricted stock is not "wages" under the CWCA, so Rodemer cannot make a CWCA claim. The CWCA currently excludes from the definition of "wages" amounts that are not yet "vested." See Colo. Rev. Stat. § 8-4-101(8). The version of the CWCA that prevailed when Rodemer was employed did not include this provision, but Colorado courts had already reached the same conclusion with respect to claims prior to the change. See Barnes, 787 P.2d at 209 ("[C]ompensation is earned if it is vested pursuant to an employment agreement at the time of an employee's termination.") (citing Rohr v. Ted Neiters Motor Co., 758 P.2d 186, 188 (Colo. Ct. App. 1988)). In Barnes, a loan officer sued to recover commissions for loans that he originated but closed after he voluntarily resigned. The court found that his employment agreement unambiguously provided that he was entitled to commissions only if they closed during the month his employment terminated. Id. at 210. He did not "earn" the commissions, so they were not subject to the waiver provision in the CWCA. Id.

-28-

Rodemer argues that commissions vested at the end of each month, and that the forfeiture

provision thus acted to take away income that had already been earned.  The CAP agreements

belie this conclusion, and may be interpreted against the plaintiffs as long as they are

unambiguous.  See John Hancock Life Ins. Co. v. Abbott Labs., 478 F.3d 1, 6-7 (1st Cir. 2006);

see also TerraMatrix, Inc. v. United States Fire Ins. Co., 939 P.2d 483 (Colo. Ct. App. 1997)

("[T]he construction of an unambiguous contract and the determination of ambiguity are

questions of law.").  The agreements provided that brokers could decide between cash

compensation and restricted stock, and that restricted stock would be forfeited upon voluntary

resignation.  See Mewhinney Order at 39 (document #716) ("[F]ollowing the purchase or award

date, a participant possessed only restricted stock.  No reasonable participant could have thought

otherwise . . . .").  The First Circuit has previously found that the CAP election forms

unambiguously provide for forfeiture of restricted stock for departing CAP participants.  See In

re Citigroup, 535 F.3d at 55.  This unambiguous forfeiture provision is inconsistent with

plaintiffs' contention that commissions vested at the end of each month.  Plaintiffs agreed to

receive restricted stock in lieu of cash compensation.  The stock they had received had not yet

vested when they resigned, and as such, cannot be considered "earned" or "wages" within the

meaning of the CWCA.  See Barnes, 787 P.2d at 209-10.  Since the unvested restricted stock was

not "wages," the no-waiver provision does not apply.  See id. at 210; Colo. Rev. Stat. § 8-4-121.

The cases cited by the plaintiff do not support a different conclusion.  Fang v. Showa

Entetsu Co. involved a forfeiture in breach of a contract; because the contract required a

severance payment, the court considered the payment to be vested wages for purposes of the

CWCA.  91 P.3d 419, 421-422 (Colo. Ct. App. 2003).  In Montemayor v. Jacor

Communications, Inc., the court decided that stock options forfeited *without a prior agreement* were vested wages within the ambit of the CWCA.  64 P.3d 916, 921-24 (Colo. Ct. App. 2002). Similarly, Thompson v. Cheyenne Mountain School District No. 12 ruled that vacation pay for unused vacation time constituted vested wages "when the contract fails to address that question." 844 P.2d 1235, 1237 (Colo. Ct. App. 1992).  In contrast to those cases, this case involves a defendant who "executed the unambiguous CAP documents to the letter"; there is no basis to conclude that the restricted stock had vested.  Mewhinney Order at 50 (document #716).[13]  At the very least, these circumstances demonstrate that Citigroup did not "willfull[y]" violate the CWCA.  As a result, the Court will dismiss Rodemer's CWCA claim (Count I).[14]

### D.    Louisiana Labor Statute

Renaudin claims that Citigroup violated Louisiana's labor statute because it withheld "earned wages" and made employees forfeit those wages upon their resignation.  The statute provides that when an employee resigns, his employer must pay the amount "then due under the terms of employment."  La. Rev. Stat. § 23:631(A)(1)(a).  The Lousiana Supreme Court has explained that the statute is "designed to compel prompt payment of *wages* upon an employee's

---

[13] The final case Rodemer cites involves public policy concerns that not relevant here.  See Equitex v. Ungar 60 P.3d 746 (Colo. Ct. App. 2002).  That case did not involve the CWCA; instead, the lawsuit concerned an indemnification agreement between a corporation and its agent.  The court held that public policy prevents indemnification of a corporate officer for the intentional wrongful act of failing to transfer stock after it was purchased.  Id.  Assuming that this case stands for the proposition that Colorado law may invalidate contracts on public policy grounds, plaintiff has not demonstrated a public policy against the type of contract at issue here.

[14] Since I find that Colorado law is sufficiently clear on all of Rodemer's claims, I decline to certify questions to the Colorado Supreme Court.  See In re Citigroup, 535 F.3d at 62 ("'When state law is sufficiently clear . . . to allow a federal court to predict its course, certification is both inappropriate and an unwarranted burden on the state court.'" (quoting Manchester Sch. Dist. v. Crisman, 306 F.3d 1, 14 (1st Cir. 2002) (alteration in original))).  Louisiana does not allow federal district courts to certify questions to the Louisiana Supreme Court, so there is no need to address whether Louisiana law is sufficiently clear on the issues in Renaudin's case.  See Arledge v. Holnam, Inc., 957 F. Supp. 822, 825 n.13 (M.D. La. 1996) (citing La. Rev. Stat. § 13:72.1).

discharge or resignation." Boudreaux v. Hamilton Medical Group, Inc., 644 So. 2d 619, 621 (La. 1994) (citing Mason v. Norton, 360 So. 2d 178, 180 (La. 1978)). The court also said that the statute must be "strictly construed" because it is meant to be punitive. Id.

Renaudin and his fellow class members' unvested stock awards do not constitute amounts "then due" under the terms of employment. The CAP participants voluntarily chose to receive restricted stock instead of cash compensation under an agreement that said any unvested restricted stock would be forfeited if the employee voluntarily resigned. This agreement was part of the terms of employment, see infra Section III.E, so the amounts paid in restricted stock could not have been "due" at the time of resignation. Indeed, the CAP election forms specified that the unvested restricted stock was not due if the employee resigned. See Jerome Renaudin's Election to Receive Restricted Stock (document #744-6)

The Louisiana Supreme Court has gone even further in defining whether payments are earned wages, and stated that the statute does not apply to termination payments based on the amount of wages, even if the payments were contractually required. See Boudreaux v. Hamilton Medical Group, Inc., 644 So. 2d 619, 622 (La. 1994). Instead, the statute applies only to "money that is paid or received for work or services, as by the hour, day or week." Id. at 622. In this case, plaintiffs forfeited only restricted stock where the amount of the stock was related to their normal pay, much like the termination payments in Boudreaux. The rule in Boudreaux applies with even greater force to the plaintiffs here: Their CAP contracts specified that unvested stock would be forfeited.

Other cases cited by the plaintiffs are likewise not applicable. In a case where no contract applied, Rubenstein Bros. v. LaForte, the Louisiana Supreme Court awarded

commissions to a salesman because the employer had no policy barring recovery of commissions

after resignation.  320 So. 2d 303, 305-06 (La. 1975).  Potvin v. Wright's Sound Gallery, Inc.

awarded monthly commissions that were contractually required where the "suspension without

pay" exception relied on by the employer did not apply.  568 So.2d 623, 626-27 (La. Ct. App.

1990).  In this case, on the other hand, a contract does exist, and it specifies unambiguously that

unvested restricted stock awards will be forfeited.

Renaudin also alleges that the defendants violated another provision of the statute that

forbade mandatory forfeiture provisions upon resignation.  La. Rev. Stat. § 23:634; see also

Beard v. Summit Inst. for Pulmonary Med. & Rehab., Inc., 707 So.2d 1233, 1235 (La. 1998).  As

the First Circuit has already recognized, participation in the CAP Payroll Program was "entirely

voluntary."  See In re Citigroup, 535 F.3d at 49-50.  Renaudin has also acknowledged that he

was not forced to participate in the program.  Renaudin Dep. at 77:16-23 (document #744-4).

Since employees could choose to receive their income in the form of cash that would not be

subject to forfeiture provisions, they undoubtedly were not "require[d]" to sign forfeiture

agreements, and this section of the statute does not apply to them.  La. Rev. Stat. § 23:634.

The Louisiana Supreme Court may have extended the reach of § 23:634 slightly when it

recognized a public policy against forfeiture when a manager did not receive deferred

compensation because he was terminated without cause.  Morse v. J. Ray McDermott & Co., 344

So. 2d 1364 (La. 1977) (Morse II), aff'g in part and rev'g in part on reh'g, Morse v. J. Ray

McDermott & Co., 344 So. 2d 1353 (La. 1976) (Morse I).  Nevertheless, the court distinguished

that case from a situation where an employee "resign[ed] before completion of the term

contractually required for vesting of the delayed compensation."  Morse I, 344 So. 2d at 1359

-32-

n.9.[15]  In accordance with that dicta, a later case upheld a forfeiture provision when an employee

voluntarily resigned, and limited Morse's applicability to cases in which an employer terminated

the employee "unilateral[ly]."  Cornet v. Cahn Electric Co., Inc., 434 So. 2d 1052, 1056 (La.

1983).  Although the circumstances in Cornet are different from this case--the employees there

had not forgone cash compensation to participate in the bonus plan at issue--the point remains

that Morse's public policy analysis is meant for situations where the employer's actions after

adopting a deferred compensation plan caused the forfeiture.  In this case, the plaintiffs chose to

leave before their stock awards had vested, and Morse does not apply.

In sum, Citigroup could not have violated the Louisiana Labor statute when it enforced a

contract for employees to receive restricted stock at a discount in lieu of cash compensation.

The CAP contract was voluntary, and unvested, restricted stock was not due to the employees at

the time of their departure.  Renaudin's statutory claim (Count I) fails as a matter of law.

### E.    Breach of Employment Contract Claims

Rodemer and Renaudin argue that Citigroup is not entitled to summary judgment on the

breach of employment contract claims because a jury could find that an oral contract existed, or

that the commission grid in a 1994 Financial Consultant Compensation Plan document ("the

1994 Plan") constituted a contract.  Citigroup contends that no oral contract existed and disputes

that the written 1994 plan was a contract.  Citigroup also argues that if a contract existed, CAP

validly modified it.

---

[15] This quote is from the original opinion that was later reheard.  The Louisiana Supreme Court ruled in both opinions that the employee was entitled to deferred compensation on public policy grounds.  See Morse II, 344 So. 2d at 1371; Morse I, 344 So. 2d at 1361.  The decisions differed only with respect to their treatment of a separate retirement plan.  Morse II, 344 So. 2d at 1371; Morse I, 344 So. 2d at 1361.

On the oral contract issue, the plaintiffs allege that defendants orally agreed to pay brokers all earned commissions.  See Renaudin Am. Compl. ¶¶ 21-22 (document #315); Rodemer Compl. ¶¶ 25-26 (document #744-2).  Citigroup responds that there is insufficient evidence to show the existence of a contract.  The plaintiffs have not provided the date a contract was made, its terms, or individuals who entered the agreement.  When a party has not provided information regarding such basic elements of a contract, summary judgment is appropriate.  See Cadle Co. v. Hayes, 116 F.3d 957, 961 (1st Cir. 1997).  This Court has recognized that "conclusory allegations, improbable inferences, and unsupported speculation will not suffice" at the stage of summary judgment.  Practice and Procedure Order 20, at 6 (document #506).

On a related note, the plaintiffs contend that the existence of a contract must be decided by a jury.  See Crowe v. Homesplus Manufactured Housing, Inc., 877 So. 2d 156, 161 (La. Ct. App. 2004); I.M.A., Inc. v. Rocky Mountain Airways, Inc., 713 P.2d 882, 887 (Colo. 1986).  In federal court, however, the federal rules of civil procedure provide the relevant summary judgment standard.  See Roberts v. Delta Air Lines, Inc., No. 07-cv-12154, 2008 WL 5156654, at *5 n.14 (D. Mass. Dec. 4, 2008).  The question here is whether a "genuine issue of material fact" exists.  Fed. R. Civ. P. 56(c).  In any event, Louisiana courts have dismissed breach of contract claims on summary judgment when there is insufficient evidence that a contract exists.  See Schwarz v. Adm'rs of the Tulane Educ. Fund, 699 So. 2d 895, 899 (La. Ct. App. 1997).  Similarly, Colorado courts recognize that the issue of the existence of a contract is appropriate for a jury "when the existence of a contract is in issue, and the evidence is conflicting or admits of more than one inference."  I.M.A., 713 P.2d at 887.  In this case, there is no evidence to show

-34-

the existence of an oral contract; the issue is not appropriate for a jury and must be decided against the plaintiffs as a matter of law.

It is not necessary to decide whether the 1994 Plan met criteria under Colorado and Louisiana law for a contract, because the forfeiture provision did not contravene that document. The 1994 Plan states that brokers may choose to participate in a 25% discount plan for restricted stock purchases and that those stock purchases vest in two years. 1994 Plan at introductory page, 24 (document #744-17). These statements alone may be sufficient to show that CAP did not violate the Plan.[16] It is not necessary to rely only on those documents, however, because the CAP election would have modified any prior contract.

As the First Circuit recognized under Florida law, the election to participate in the CAP Payroll Program served as a "formal modification" of any prior contract. In re Citigroup, 535 F.3d at 57. The result is the same under Colorado and Louisiana law. Parties to a contract in both states may modify the terms of a contract by mutual consent. See Atchison v. Englewood, 568 P.2d 13, 19 (Colo. 1977); Fleming v. JE Merit Constructors, Inc., 985 So. 2d 141, 146 (La. Ct. App. 2008). The election forms signed by the Louisiana and Colorado plaintiffs specify that they agree to "irrevocably" participate in CAP subject to its terms and conditions and that restricted stock and associated compensation will be forfeited upon voluntary resignation. See Steven Rodemer's 1995 CAP Election Form (document #744-5); Jerome Renaudin's 1996 CAP Election Form (document #744-6).

---

[16] Plaintiffs also contend that brokers "received a written employment manual" with a "commission grid." Pls.' Mem. in Opp'n to Def.'s Mot. for Summary Judgment at 12 (document #752). It is unclear whether this statement refers to the 1994 Plan, which contained commission grids. The plaintiffs have not presented any other employment manual, and, in any case, any agreement contained in such a manual would have been modified by the CAP election.

-35-

Plaintiffs argue that the modification fails for lack of mutual assent or consideration. <u>See</u> <u>Vance v. Casebolt</u>, 841 P.2d 394, 399 (Colo. Ct. App. 1992) (requiring mutual consent for modification of a contract); <u>Hoagland v. Celebrity Homes, Inc.</u>, 572 P.2d 493, 494 (Colo. Ct. App. 1977) (requiring consideration); <u>Vinet v. Estate of Calix</u>, 860 So.2d 160, 163 (La. Ct. App. 2003) (requiring mutual consent). <u>But see</u> <u>Jones v. Motiva Enters. LLC</u>, 2002 U.S. Dist. LEXIS 15669, at *9 (E.D. La. Aug. 20. 2002) ("The Court has found no Louisiana cases that require separate consideration for a valid contract modification."). The documents themselves, however, demonstrate mutual consent to modify any prior contract. <u>See</u> Practice and Procedure Order 20, at 9 (document #506) (holding that signatures on the election form and restricted stock award show no material issue of disputed fact as to assent); <u>Pierce v. St. Vrain Valley Sch. Dist. RE-1J</u>, 981 P.2d 600, 603 (Colo. 1999); <u>Bagley v. Prof'l Servs. Group, Inc.</u>, 856 So. 2d 1286, 1292 (La. Ct. App. 2003). On the issue of consideration, the Court has already ruled that CAP's benefits—such as its discount on stock price and tax benefits from income deferral--are "sufficient to constitute consideration." Practice and Procedure Order 20, at 7 (document #506); <u>see also</u> <u>In re Citigroup</u>, 535 F.3d at 57.

Since there is insufficient evidence of an oral contract, and all CAP participants in Louisiana and Colorado signed CAP election forms that validly modified any prior written contract, the Breach of Employment Contract claims (Count II in both complaints) is dismissed.

### F.    Breach of CAP Contract Claims

The plaintiffs assert that Citigroup breached the CAP contract because its forfeiture provision is unenforceable as a matter of public policy. As discussed above, the forfeiture

provisions do not violate the public policy of either state as expressed in the Colorado Wage Act and Louisiana Labor Statute.

Moreover, Colorado and Louisiana courts have previously accepted and enforced unambiguous forfeiture provisions.  See Barnes, 787 P.2d at 209; Giammanchere v. DiGiovanni, 43 So. 2d 274, 275-76 (La. Ct. App. 1949).  In Barnes, the court allowed forfeiture of commissions after a loan officer voluntarily resigned because his contract specified that he would only receive commissions for loans that closed by his last month of employment.  787 P.2d at 208-09.  Giammanchere permitted forfeiture of a deposit because a real estate sale was not complete by the time stated unambiguously in the contract.  43 So. 2d at 275-76; see also Shelton v. Standard/700 Assocs., 778 So. 2d 1265, 1268-69 (La. Ct. App. 2001) ("Louisiana law is clear that a contract, if its terms and conditions are clear and unambiguous, must be enforced as written."), *aff'd* 798 So. 2d 60 (La. 2001).  The First Circuit and this Court have previously concluded that the CAP documents unambiguously provide for forfeiture.  See In re Citigroup, 535 F.3d at 55, 60; Mewhinney Order at 39, 45 (document #716).

The cases plaintiffs cite to support their claim that forfeiture provisions are unlawful under Colorado and Louisiana law are inapplicable.  In Serv. Investors Ltd. v. Scully, a Louisiana appeals court refused to enforce a contractual penalty equivalent to a full year's salary assessed against an employee for leaving prior to the end of a five-year term.  9 So. 3d 910, 916 (La. Ct. App. 2009).  In contrast, Renaudin's case involves the forfeiture of unvested stock, rather than a mandated payment to an employer upon resignation.  In addition, Renaudin was able to choose whether to receive income in the form of discounted restricted stock or cash that would not be subject to forfeiture, whereas the employer in Scully did not offer an alternative

-37-

employment contract without a penalty provision.  See id. at 912.  Montz v. Theard held that a

real property seller could not keep payments received prior to a buyer's eventual default pursuant

to a forfeiture provision; the case does not address forfeiture provisions in employment contracts

like the one at issue here.  818 So.2d 181, 190-191 (La. Ct. App. 2002) ("[T]he default and

forfeiture provisions must be evaluated in terms of the jurisprudentially expressed public policy

related to deeds of sales in Bond for Deed contract transactions.").  As discussed in Section III.C,

supra, the cases Rodemer cites--Equitex and Thompson--do not support a conclusion that the

forfeiture provisions at issue here should be rejected.  Equitex involved irrelevant public policy

concerns, while Thompson dealt with forfeiture in the absence of an agreement.  See Equitex, 60

P.3d at 750; Thompson, 844 P.2d at 1237.  In fact, the Thompson court said that an "express

agreement" for forfeiture, such as the one at issue here, could be enforceable.  844 P.2d at 1237.

Renaudin also offers cases that reject certain noncompetition covenants as overbroad.

See SWAT 24 Shreveport Bossier, Inc. v. Bond, 808 So. 2d 294, 298, 308 (La. 2001); Pelican

Publ'g Co. v. Wilson, 626 So. 2d 721, 723 (La. Ct. App. 1993); see also Moorman & Givens v.

Parkerson, 54 So. 47, 48 (La. 1911) (explaining that Lousiana law does not support unreasonable

noncompetition provisions).  The First Circuit has already rejected an argument that the Plan

acted as an effective noncompetition provision that would punish employees:

> Rather than establishing that one of the key objectives of the CAP
> is to "'punish' those who leave and go to a competitor," the memo
> merely states that if this is one of the objectives, the "current
> structure of the plan *does not work toward[] [this] objective[]*
> because . . . the Plan makes no distinction between 'leaving the
> business' versus leaving the company to go work for a
> competitor."  (Emphasis added).  This statement merely confirms
> that the CAP forfeiture provisions do not operate to restrict a
> departing participant from working for a competing company.

In re Citigroup, 535 F.3d at 58 n.13 (quoting Mem. from J.H. Dietzel to B.L. Mannes (May 23, 1991) (document #755-8)).  It is not appropriate to apply the cases cited by Renaudin to the circumstances of this case because the Plan was not designed primarily to punish individuals who go to work for a competitor.  The Louisiana cases were motivated by "an underlying state desire to prevent an individual from contractually depriving himself of the ability to support himself and consequently become a public burden."  SWAT 24, 808 So. 2d at 298.  This public policy concern has no application here, where named plaintiffs were able to find other jobs, and there is no evidence that other class members, who left voluntarily, could not procure employment.

Since the forfeiture provisions are unambiguous, do not violate the public policy of either state, and are not unlawful noncompetition clauses, Citigroup is entitled to summary judgment on the Breach of CAP Contract claims (Count III in both complaints).

### G.    Conversion Claims

The plaintiffs argue that Citigroup is liable for conversion because it wrongfully took control of restricted stock that belonged to brokers.  Colorado law provides that conversion is an "unauthorized act of dominion or ownership . . . over personal property belonging to another." Byron v. York Inv. Co., 296 P.2d 742, 745 (Colo. 1956).  Similarly, Louisiana law defines conversion as "an act in derogation of a plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time."  Fuller v. XTO Energy, Inc., 989 So. 2d 298, 302 (La. Ct. App. 2008). To prevail on a conversion claim in either state, a plaintiff must show that he has some type of possessory or ownership right in the property at issue.  When a party merely exercises its rights

under a valid contract, his acts do not constitute conversion. See Byron, 296 P.2d at 745;

Commercial Credit Equip. Corp. v. People's Loan Serv., Inc., 351 So. 2d 852, 853 (La. Ct. App.

1977) ("Conversion, a wrongful act, cannot spring from the exercise of a legal right.").

        As a preliminary matter, the plaintiffs have sufficiently established that they had some

ownership or possessory right in the restricted stock. Essentially, they had an interest in

restricted stock that would vest if they continued working at Citigroup for two years after the

restricted stock award, or if they were fired for cause within that period. See In re Marriage of

Miller, 915 P.2d 1314, 1315 (Colo. 1996) (recognizing an ownership interest in restricted stock);

Mestayer v. Williams, 569 So. 2d 1102, 1106 (La. Ct. App. 1990) (same); see also Quealy v.

Paine, Webber, Jackson & Curtis, Inc., 475 So. 2d 756, 761 (La. 1985) (stating that stock may be

the subject of a conversion action). The plaintiffs' conversion claims are thus based on

Citigroup's allegedly "wrongful[]" actions in enforcing CAP's forfeiture provision with respect

to the restricted stock. Pls.' Mem. In Opp'n to Def.'s Mot. for Summary Judgment at 16, 25

(document #752).

        These actions, however, could not be "wrongful" if they were done in accordance with a

contract. See Byron, 296 P.2d at 745; Commercial Credit, 351 So.2d at 853; cf. Glenn Arms

Assocs. v. Century Mortgage & Investment Corp., 680 P.2d 1315, 1317 (Colo. Ct. App. 1984)

(implying that taking funds in breach of a contract could be the basis for liability on a conversion

theory). As the First Circuit has recognized under Florida and Georgia law, "[b]ecause [the

plaintiff's] ownership right to the restricted stock or its equivalent monetary amount was subject

to the terms of the CAP agreement, the forfeiture of those items was not 'inconsistent with'

[plaintiff's] rights or an 'unauthorized appropriation.'" In re Citigroup, 535 F.3d at 62.

-40-

Similarly, under Colorado and Louisiana law, Citigroup merely enforced a valid forfeiture provision, which is both an "authorized" act of dominion and a valid assumption of control over the property. As a result, Citigroup is entitled to summary judgment on the plaintiffs' Conversion claims (Count IV in both complaints).

### H.    Unjust Enrichment

In their complaints, Rodemer and Renaudin asserted claims for unjust enrichment on behalf of their respective state classes. See Rodemer Compl. ¶¶43-47 (document #744-2); Renaudin Am. Compl. ¶¶35-37 (document #315). Citigroup's memorandum primarily argues that the unjust enrichment claims were foreclosed because express contracts covered the same subject matter. The plaintiffs do not respond to this or Citigroup's alternative arguments in their opposition to summary judgment. In the First Circuit, "an issue raised in the complaint but ignored at summary judgment may be deemed waived." Grenier v. Cyanmid Plastics, Inc., 70 F.3d 667, 678 (1st Cir. 1995); see also Schneider v. Local 103 I.B.E.W. Health Plan, 442 F.3d 1, 3 (1st Cir. 2006) (affirming summary judgment dismissal of an unjust enrichment claim when the plaintiff did not respond to defendants' arguments against the claim). The claims were not addressed at summary judgment so they should be deemed waived.

Even if these claims were not waived, they would fail for the reason Citigroup provides: Colorado and Louisiana law preclude recovery for unjust enrichment when a valid contract covers the same subject matter. See Bedard v. Martin, 100 P.3d 584, 592 (Colo. Ct. App. 2004); Wilkins v. Hogan Drilling Co., 471 So. 2d 863, 867 (La. Ct. App. 1985). In these cases, the CAP contracts cover the same subject matter as the unjust enrichment claims. The plaintiffs' Unjust Enrichment claims for "earned income" must be rejected (Count V in both complaints).

I.      **Renaudin's Claims for Interest on Forgone Cash Compensation**

Renaudin asserts three separate claims--breach of employment contract, conversion, and unjust enrichment--for interest on money withheld during the six-month periods between periodic restricted stock purchases.  He notes that the defendants subtracted money from monthly paychecks based on the CAP election, and that Smith Barney initially paid interest during the period before the restricted stock purchase but stopped paying interest in 1990. Citigroup counters that no interest-bearing account ever existed for CAP contributions, and that it had no contractual obligation to pay interest to CAP participants.  According to Citigroup, the "interest" payments when the defendants first introduced the CAP program were meant to compensate for a "time lag" between the payroll date and award date before the Plan started averaging share prices over the term before the restricted stock award.

The Court addressed a similar claim in the <u>Mewhinney</u> (Texas) case:

> Nothing in the CAP documents refers to the placement of funds in an interest-bearing account or otherwise confers on Citigroup a duty to invest property for the trust estate.  Nor have the plaintiffs offered any evidence whatsoever to show that the funds actually were placed in an interest-bearing account and that Citigroup kept the interest as an unlawful benefit.  At most, Citigroup failed to make the deducted compensation productive—but that obligation is neither expressed nor implied in the CAP.  Citigroup executed the unambiguous CAP documents to the letter.

<u>Mewhinney</u> Order at 50 (document #716).  As in that case, the parties disagree on whether Smith Barney held funds in interest bearing accounts.  Indeed, Renaudin has presented evidence that-- interpreting the facts in the light most favorable to the plaintiffs--could show that Citigroup held the funds in such an account.  <u>See</u> Memorandum from J.H. Dietzel (June 8, 1989) (document #755-11) (noting that some employees were upset about "[n]on-payment of interest on the

money set aside from the brokers' paychecks"); Memorandum from J.H. Dietzel (June 9, 1989) (document #755-12) (same). Nevertheless, the point remains that participants in CAP chose to forgo cash compensation in favor of a discounted restricted stock award with clear, well-disclosed terms, that do not provide for the payment of interest. Regardless of the accounting method that Citigroup employed, it could not have been breached its employment contract because it acted in accordance with a valid modification of that contract, as explained in Section III.E. Citigroup also cannot be liable for conversion or unjust enrichment, because it followed the terms of the CAP contract. See supra Sections III.G, III.H.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment in the Colorado and Louisiana Cases (**document #741**) is **GRANTED** in its entirety; plaintiffs Renaudin and Rodemer's Cross-Motion for Summary Judgment (**document #753**) is **DENIED** in its entirety; **JUDGMENT** for the defendants in the Colorado and Louisiana cases.[17] Plaintiffs Hundt, Neal, and Norman's Motion to Certify a Nebraska Class (**document #765**) and plaintiff Barber's Motion to Certify a Michigan Class (**document #769**) are **GRANTED IN PART** to the extent they seek certification of a class comprised of participants in the Payroll Program, and **DENIED IN PART** with respect to individuals who participated in only the Bonus Program.

**SO ORDERED.**

Date:  January 6, 2010              /s/ Nancy Gertner

                                   **NANCY GERTNER, U.S.D.C.**

---

[17] Citigroup's counterclaims are moot because they are conditioned on a judgment in favor of the plaintiffs. See Renaudin v. Smith Barney, Inc., Answer at 6-8 (document #316); Rodemer v. Smith Barney, Inc., Answer at 5-6 (document #185).